**FUTUREVISION CABLE SYSTEMS OF WIGGINS, INC., Futurevision Cable Systems of Houston, Inc., Futurevision Cable Systems of Water Valley, Inc., Futurevision Gulf Coast Cable Systems, Inc., and Futurevision Cable Systems of Grenada, a Mississippi Corporation, Plaintiffs,**

v.

**MULTIVISION CABLE TV CORP., U.S. Cable Television Group, L.P., U.S. Cable Partners, B & E Grenada, Inc., ESPN, Inc., TNT, Inc., and the Learning Channel, Inc., Defendants.**

Civ. A. No. E91–0039(L).

United States District Court,
S.D. Mississippi, E.D.

March 17, 1992.

---

Judah Labovitz (Pro Hac Vice) Robert Ross, Philadelphia, Pa., Shelby D. Goza, Hal S. Spragins, Oxford, Miss., for B & E Grenada, Inc.

Alan W. Perry, Fred Krutz, III, Daniel J. Mulholland, Walter H. Boone, Jackson, Miss., for plaintiffs.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

Defendants Multivision Cable TV Corporation (Multivision) and B & E Grenada, Inc. (B & E) operate cable television systems in various areas of Mississippi and elsewhere. Plaintiff Futurevision Cable Systems, Inc.[1] is a cable system overbuilder, which enters areas already being served by a cable service provider, overbuilds that system and begins to operate in competition with the existing cable provider. Beginning in the late 1980's, Futurevision overbuilt and began to offer cable television service in Houston, Water Valley, and Wiggins, Mississippi, areas in which Multivision was operating, and Grenada, Mississippi, which was then served exclusively by B & E.

At or about the time of Futurevision's entry into these areas, The Learning Channel entered into a contract with B & E covering Grenada, Mississippi, pursuant to which it granted B & E the exclusive right to broadcast The Learning Channel programs in that city. Similarly, ESPN entered into an agreement with Multivision whereby it agreed that Multivision would have the exclusive right to broadcast Sunday Night Football in Water Valley, Wiggins and Houston. In its complaint in this action, Futurevision alleges, *inter alia*, that these exclusive dealing contracts between Multivision and B & E and the cable programming providers (The Learning Channel and ESPN) constitute unlawful restraints of trade in violation of section 1 of the Sherman Act. Futurevision further alleges, as a violation of section 1, that The Learning Channel and ESPN are part of a conspiracy among cable programming providers to prevent overbuilders such as Futurevision from entering the cable services market. In addition, Futurevision's complaint charges that both The Learning Channel and ESPN have violated section 2

---

1. Plaintiffs in this lawsuit are Futurevision Cable Systems of Wiggins, Inc., Futurevision Cable Systems of Houston, Inc., Futurevision Cable Systems of Water Valley, Inc., Futurevision Gulf Coast Cable System, Inc. and Futurevision Cable Systems of Grenada. The plaintiffs that are involved in the present motion before the court are Futurevision Cable Systems of Wiggins, Houston, Water Valley and Grenada, which will be referred to herein collectively as Futurevision.

of the Sherman Act by assisting Multivision and B & E in monopolizing the relevant cable service markets.[2] Finally, the complaint asserts claims against both defendants for price discrimination and violations of Mississippi antitrust laws, as well as a claim against The Learning Channel for tortious breach of contract.

ESPN has moved to dismiss the complaint against it for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure based on its assertion that "the bare allegation that ESPN entered into agreements with Multivision and B & E in which ESPN granted those operators the exclusive right to carry Sunday Night Football" does not state a claim that ESPN has violated either section 1 or 2 of the Sherman Act. The Learning Channel also seeks dismissal for failure to state a claim, asserting as grounds for its motion that Futurevision failed to plead that The Learning Channel has the necessary market power so that its exclusive dealing contract with B & E constitutes an unlawful vertical agreement under section 1 of the Sherman Act. The Learning Channel further claims that Futurevision's allegations of conspiracy between The Learning Channel, ESPN and other programming suppliers are mere conclusory allegations which do not state a claim under either section 1 or 2 of the Act. As such, both ESPN and The Learning Channel contend that any state law claims against them should be dismissed for lack of jurisdiction.

In assessing the allegations of Futurevision's first amended complaint in light of defendants' motions to dismiss, this court is necessarily mindful of the teachings of the Supreme Court in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In accordance with *Conley,* the Fifth Circuit has held: "[A] motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty

that the Plaintiff would not be entitled to recover under any state of facts which could be proved in support of his claim." *Larry R. George Sales Co. v. Cool Attic Corp.,* 587 F.2d 266, 270 (5th Cir.1979) (citations omitted). With all deference to the rule recounted above, the court is of the opinion that all Sherman Act claims against defendants ESPN and The Learning Channel must be dismissed for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). The court further concludes that all state law claims against these defendants must be dismissed for want of jurisdiction.

### A. Futurevision's Section 1 Claim

■ Section 1 of the Sherman Act prohibits contracts, combinations and conspiracies which unreasonably restrain trade. 15 U.S.C. § 1. To establish a violation of section 1, " 'plaintiff must prove (1) the existence of an agreement (2) which unreasonably restrains trade (3) to the damage of the plaintiff.' " *J.T. Gibbons, Inc. v. Crawford Fitting Co.,* 704 F.2d 787 (5th Cir. 1983) (quoting *Abadir & Co. v. First Mississippi Corp.,* 651 F.2d 422, 424 (5th Cir. 1981)). Failure to allege either the existence of an agreement or restraint of trade justifies dismissal of a section 1 claim. *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.,* 854 F.2d 802, 805 (6th Cir.1988).

■ "Contracts, combinations, and conspiracies in restraint of trade covered by section 1 ... are of two types, horizontal or vertical." *Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 295 (5th Cir. 1981). Horizontal restraints involve agreements between or among competitors at the same level of distribution to restrain trade. Vertical restraints, on the other hand, involve agreements between firms at different levels of distribution, e.g., manufacturers and distributors, to restrain

---

**2.** By amendment to its complaint, Futurevision asserted identical claims against TNT, Inc. TNT, Inc. moved for dismissal of the claims against it on the basis of insufficiency of service of process, which motion was denied by the court. TNT, Inc. has not filed its own motion or joined in the present motions by ESPN and The Learning Channel. In addition to its claims

against The Learning Channel, ESPN and TNT, Inc., Futurevision asserted claims against Multivision and B & E for alleged violations of federal and state antitrust laws. The court notes, however, that by way of an Agreed Order Of Dismissal entered March 12, 1991, all claims by Futurevision against Multivision have been dismissed with prejudice.

trade. *Carlson Mach. Tools, Inc. v. American Tool, Inc.*, 678 F.2d 1253, 1259 (5th Cir.1982). Since different antitrust principles apply depending on whether a given restrain of trade is either horizontal or vertical, classification is thus critically important. For example, while horizontal restraints are ordinarily illegal per se, vertical restraints are tested under the rule of reason. *Id.* (citing *Continental T.V. Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2561–2562, 53 L.Ed.2d 568 (1977)).

In its brief, Futurevision asserts that its complaint sufficiently alleges section 1 claims of both types, vertical and horizontal restraints of trade. The court must, therefore, determine whether Futurevision's complaint states a claim under either theory. If the complaint has sufficiently pleaded either a vertical or horizontal conspiracy in restraint of trade, then Futurevision's section 1 claim must stand.

### 1. *Futurevision's Vertical Conspiracy Claim*

 Futurevision's complaint alleges that "[b]ecause of the popularity of the programming (of ESPN and The Learning Channel), and the cumulative effect of this growing foreclosure to overbuilders, new entrants to the market such as Futurevision Plaintiffs are placed at a serious competitive disadvantage in entering the markets served by the existing entrenched monopolies." ESPN acknowledges that there is an agreement here, i.e., that it has entered into contracts granting Multivision and B & E the exclusive right to show Sunday Night Football in certain Mississippi towns, while Futurevision has available to it only regular ESPN programming. Likewise, The Learning Channel acknowledges that the complaint has sufficiently alleged an agreement between The Learning Channel and B & E. They contend, however, that Futurevision has failed to sufficiently allege that these agreements

unreasonably restrain trade or have caused any damage to Futurevision. ESPN relies, in support of its position, on the premise that the Sherman Act does not "restrict the right of a trader or manufacturer ... freely to exercise [its] own independent discretion as to the parties with whom [it] will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). A manufacturer has a right to deal, or refuse to deal, with whomever it chooses, as long as it does so independently. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 1473, 79 L.Ed.2d 775 (1984). That is, a unilateral refusal to deal is not an antitrust violation. Thus, the "mere existence of an exclusive dealing clause in a contract does not establish an antitrust violation." *Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1036 (5th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981). *See also Northeastern Educ. Television of Ohio, Inc. v. Educational Television Assoc.*, 758 F.Supp. 1560, 1561 (N.D.Ohio 1990) (marketing of exclusive rights to television programs is not itself violative of the antitrust laws) (quoting *Association of Indep. T.V. Stations v. College Football Ass'n*, 637 F.Supp. 1289, 1304 (W.D.Okla. (1986)); *Elder–Beerman Stores Corp. v. Federated Dep't Stores*, 459 F.2d 138, 144 (6th Cir.1972) (not a per se violation of antitrust laws for supplier to agree to give distributor exclusive franchise, even if it means cutting off another distributor). Rather, "[v]ertical non-price restraints are tested under the rule of reason; that is, the plaintiff must prove that the restraint had an anticompetitive effect in the relevant market in order to prevail." *Muenster Butane*, 651 F.2d at 295.

 Rule of reason analysis requires that the legality of the challenged agreement be determined by considering the actual anticompetitive effects of the challenged practice. *Carlson*, 678 F.2d at 1259.[3] The rule of reason condemns only

---

**3.** This is contrasted "with the principle of per se unreasonableness, where the practice complained of has such an inherently harmful effect on competition that it should be 'conclusively

presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm' created by the practice." *Carlson*, 678 F.2d at 1259 (quoting *Northern Pacific Ry. Co. v.*

those restraints that actually harm competition, as opposed to merely hurting a competitor. *National Soc. of Professional Eng'rs v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). Thus, unless plaintiff can demonstrate that the exclusive dealing provision at issue "adversely affect[s] competition" in the relevant market, the agreement will not be in violation of section 1.[4]

The critical analysis in determining the effects on competition of any vertical restraint requires a comparison of the effects on "intrabrand" and "interbrand" competition. *Muenster Butane,* 651 F.2d at 296 (citing *Continental T.V.,* 433 U.S. at 52, 97 S.Ct. at 2558). In *Continental T.V.,* the Supreme Court explained the distinction between interbrand and intrabrand competition:

Interbrand competition is the competition among the manufacturers of the same generic product—television sets in this case—and is the primary concern of antitrust law. The extreme example of a deficiency of interbrand competition is monopoly, where there is only one manufacturer. In contrast, intrabrand competition is the competition between the distributors—wholesale or retail—of the product of a particular manufacturer.

*Continental T.V.,* 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19. "[A]s long as interbrand competition acts as a 'significant check on the exploitation of intrabrand market power,' a supplier's termination of a distributor or dealer is not a violation of the antitrust laws." *Muenster Butane,* 651 F.2d at 297 (quoting *Continental T.V.,* 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19). *See also Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001,

1005–07 (5th Cir.), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981); *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1116 (5th Cir.1979); *Daniels v. All Steel Equip., Inc.,* 590 F.2d 111, 113 (5th Cir.1979); *H & B Equip. Co. v. International Harvester Co.,* 577 F.2d 239, 246 (5th Cir.1978); *Northwest Power Prods., Inc. v. Omark Indus.,* 576 F.2d 83, 90–91 (5th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). In fact, in *H & B Equipment Co. v. International Harvester Co.,* 577 F.2d 239 (5th Cir.1978), the Fifth Circuit held that even if a conspiracy between a supplier and its distributors to eliminate another distributor were proven, the supplier would not have violated the antitrust laws. The reason is that any reduction in intrabrand competition would have, at most, a *de minimis* effect on the "healthy" interbrand rivalry from other dealers. *Id.* at 246. Similarly, in *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107 (5th Cir.1979), the court held:

Precedents establish that abstract lessening of intrabrand competition is not enough. Even a concerted intent to eliminate an exclusive distributor does not necessarily establish a cause of action for violation of the antitrust laws.

*Id.* at 1116. Other circuits are in essential agreement with Fifth Circuit analysis and have therefore adopted similar principles. *See, e.g., Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.,* 854 F.2d 802, 807 (6th Cir.1988) ("[A] complaint which simply alleges that a manufacturer substituted one distributor for another fails to state a violation of the rule of reason, *unless* it also alleges anticompetitive effect at the interbrand level."); *Westman Comm'n Co. v.*

United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)).

4. Futurevision's complaint alleges that the relevant product market is cable television services, and that the relevant geographic market is each of the governmental districts within the areas served by Multivision and B & E. The court notes that some courts have held or suggested that cable television is not the relevant product market and that the appropriate market is instead passive visual entertainment, which includes cable television, satellite television, video cassette recordings and free over-the-air television. *See Cable Holdings of Georgia, Inc. v. Home Video, Inc.,* 825 F.2d 1559, 1563 (11th Cir.1987) (could not conclude that jury's determination that product market was passive visual entertainment was clearly erroneous); *Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Virginia, Inc.,* 714 F.2d 351, 355 (4th Cir.1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984). This issue is treated *infra* at pp. 768–69, 776–77.

*Hobart Int'l*, 796 F.2d 1216, 1229 (10th Cir.1986) ("The evil to be avoided is ... not the reduction of *intrabrand* competition."); *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir.), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978) ("[W]hile vertical restrictions may reduce intrabrand competition by limiting the number of sellers of a particular product, competing for a given group of buyers, they also promote interbrand competition by allowing manufacturers to achieve certain efficiencies in the distribution of its products....").

■ It is clear from the foregoing that a complaint charging restraint of trade based on a supplier's substitution of one distributor for another must allege anticompetitive effect at the interbrand level of competition to survive a Rule 12(b)(6) motion for failure to state a violation of section 1 of the Sherman Act.

■ Futurevision alleges that it has stated a section 1 vertical restraint violation since its complaint alleges the elimination of "competition among cable television system operators such as B & E and *its* competitors or potential competitors." Thus, according to Futurevision, "[t]he anticompetitive effect of exclusive dealing contracts such as that between B & E and The Learning Channel is clear." In so arguing, Futurevision attempts to distinguish the "jilted distributor" precedent of this and other circuits by suggesting that its situation involves distributors (B & E and Multivision) which have market power in the relevant cable service markets, whereas in the other cases neither party to the exclusive contract had market power. Futurevision essentially suggests that its case involves the elimination of all intrabrand competition among cable television system operators, whereas in the other cases the level of intrabrand competition was not adversely affected since neither party to the exclusive contract had market power. By suggesting that an allegation of the elimination of all intrabrand competition is tantamount to an allegation of anticompetitive effect, Futurevision implies that this court should adopt a *per se* test of illegality

under section 1 for the situation in which a supplier "jilts" a distributor, and awards an exclusive distributorship to another distributor with market power. The Supreme Court, however, has admonished that vertical restraints of trade which eliminate all intrabrand competition are nevertheless legal as long as interbrand competition acts as a "significant check on the exploitation of intrabrand market power." *Continental T.V.*, 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19. "Where ... interbrand competition [is] still vigorous, termination of a dealer is insufficient to support a Sherman Act violation." *Muenster Butane*, 651 F.2d at 298.

The Learning Channel, in support of its motion to dismiss, argues that Futurevision's inability to allege that The Learning Channel has sufficient market power in the market for programming so that an exclusive relationship with B & E in Grenada would foreclose Futurevision from obtaining sufficient programming to be able to compete in the cable services market is fatal to its claim. According to Futurevision, The Learning Channel's reading of the complaint is more restrictive than the reading which the court must give it on the present motion. Futurevision urges that it is not necessary for its vertical restraint claim that The Learning Channel or ESPN have market power in the market for cable programming. Rather, according to Futurevision, all that is necessary is the fact that its ability to compete in the cable services market is substantially restricted as a result of the exclusive contracts that ESPN and The Learning Channel, as well as other channel providers, have entered into with Multivision and B & E. It argues that, when viewed in conjunction with B & E's and Multivision's exclusive contracts with other programming suppliers, the foreclosure of competition is substantial.

■ Contrary to Futurevision's arguments, the court finds that an analysis of the market power of ESPN and The Learning Channel in the cable programming market is necessary to determine the alleged anticompetitive effects of exclusive distributorships on interbrand competition in the

market for cable services. *See Muenster Butane,* 651 F.2d at 298 ("Proof of the antitrust defendant's 'substantial' market power should be a preliminary hurdle in all restricted distributor (vertical restraint) cases."). Futurevision's complaint fails to allege a specific figure representing the percentage of market share held by ESPN or The Learning Channel in the market which supplies cable programming. Furthermore, Futurevision's conclusory allegation as to "the cumulative effect of this growing foreclosure to overbuilders" is not a substitute for a proper allegation of substantial market power in the cable programming market. Absent an allegation that The Learning Channel or ESPN have market power in the market for cable programming all that Futurevision has alleged is that The Learning Channel and ESPN, two of many programmers, prefer to distribute their programming in one area through one company rather than another. Such vertical restraints by firms which lack market power, however, "[can]not be anticompetitive at the interbrand level." *Muenster Butane,* 651 F.2d at 298 (citing Posner, *The Next Step in the Anti-trust of Restricted Distribution: Per Se Legality,* 48 U.Chi.L.Rev. 6, 16 (1981)).

What seems obvious from Futurevision's vertical restraint claim is that elimination of intrabrand competition by cable television programming suppliers is its sole concern. In this regard, Futurevision's own complaint alleges that:

34. Futurevision Plaintiffs have already entered the Wiggins, Houston and Water Valley markets and have secured a *substantial portion* of the subscribers in those markets, thus causing Multivision Defendants to face substantial competition in those three communities. 35. Prior to overbuilding Multivision Defen-

dants had 100% of the cable subscriber market in Houston, Water Valley, and Wiggins. 36. To date, Futurevision-Houston has approximately 85% of the total subscribers in the community of Houston. 37. To date, Futurevision-Wiggins has approximately 90% of the total subscribers in the community of Wiggins. 38. To date, Futurevision-Water Valley has approximately 80% of the total subscribers in the community of Water Valley. 39. *Thus, in spite of the anticompetitive activities described ...., Futurevision Plaintiffs have had remarkable success in securing cable subscribers in those three communities ....*

It would appear from Futurevision's own allegations that the actual effect of the ESPN exclusive licenses on interbrand competition in the Water Valley, Wiggins, and Houston cable service market can hardly be characterized as anything other than insignificant. Futurevision was apparently not foreclosed from competing in that market and obviously found alternative sources of supply in order to secure cable subscribers in those three communities. In response to ESPN's motion, Futurevision asserts that to survive the motion to dismiss, it is sufficient that it has alleged that ESPN's contracts have an adverse effect on competition. However, the court must conclude that the mere recitation in broad, general terms that these contracts adversely affect competition is insufficient when the court is confronted in the same pleading with the presentation of specific facts concerning the substantial success which Futurevision has experienced in the relevant geographic market.[5] Therefore, though Futurevision does go on to allege that "Multivision Defendants are engaged in unlawful and anticompetitive

---

5. This court previously observed in connection with its denial of Futurevisions's motion for a temporary restraining order against Multivision, that

Futurevision enjoyed substantial competitive success in each of the markets at issue within a relatively short period of time. During the same period of time, Multivision experienced a dramatic loss of subscribers.... Multivision did not and has not regained any signifi-

cant number of subscribers and Futurevision now has what it terms "a respectable share" of the market: 981 subscribers in Wiggins, compared to Multivision's 380, or 72 percent of the market; 840 subscribers in Water Valley compared to Multivision's 810, or 51 percent of the market; and 799 subscribers in Houston, compared to Multivision's 570, or 58 percent of the market.

actions in an attempt to force Futurevision Plaintiffs to discontinue serving those communities and thus re-establish Multivision Defendants' monopolies," that does not cure the lack of any "actual anticompetitive effect" at the interbrand level of competition. The court is of the opinion that Futurevision has presented nothing more than a conclusory allegation, and that the complaint provides no basis on which to conclude that the absence of ESPN Sunday Night Football and The Learning Channel is likely to adversely affect the ability of Futurevision to maintain a level of success in the Houston, Water Valley and Wiggins cable television service markets, or its ability to enter other cable markets in Mississippi. Moreover, regarding Grenada, Futurevision alleges only that it has recently begun to provide service there, in competition with B & E; it does not allege that it has been unable to effectively compete as a result of the exclusive arrangement described.

It is apparent from Futurevision's own complaint that the exclusive dealing contracts in this case have not had an anticompetitive effect on interbrand competition. Futurevision is still free to substitute other comparable programming for that of The Learning Channel and ESPN Sunday Night Football. Indeed, it is quite reasonable to infer from Futurevision's allegations that the exclusive contracts have increased interbrand competition by causing overbuilders such as Futurevision to go to suppliers other than ESPN and The Learning Channel to purchase programming. From the cablevision viewer's perspective, it is equally clear that the exclusive contracts increase the diversity of programming available to the viewing public. Thus, while the vertical restraints in this case may elimi-

nate some intrabrand competition, the court concludes that Futurevision's own complaint suggests that they tend " 'to be potentially beneficial to interbrand competition.' " *Crane & Shovel*, 854 F.2d at 808 (quoting *Davis–Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1196 (6th Cir. 1982)). *See also Westman Comm'n Co.*, 796 F.2d at 1227 ("[E]ven though refusals to deal limit intrabrand competition, they are likely to benefit consumers by increasing interbrand rivalry."). In fact, nowhere in the complaint does Futurevision allege that the exclusive contracts in this case have reduced interbrand competition for the programming offered by The Learning Channel, ESPN, or other cable programming suppliers. Rather, Futurevision's vertical restraint claim is based upon the reduced intrabrand competition between Futurevision and the cable television system operators who are parties to the exclusive contracts, B & E and Multivision.[6] Moreover, because there is no allegation that The Learning Channel or ESPN has sufficient market power to foreclose Futurevision from obtaining any quality programming, Futurevision's complaint has not sufficiently pleaded substantial foreclosure of market alternatives as a result of the exclusive contracts at issue. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961) (requiring that the allegedly anticompetitive restraint foreclose a substantial share in the relevant supply market).

Futurevision's complaint is simply that ESPN and The Learning Channel have decided to allow Multivision and B & E to exhibit their programming in certain locations but has not offered this programming to Futurevision.[7] Futurevision has identi-

---

**6.** Futurevision's business may have been damaged by the granting of these contracts to its competitors, but such damage is no different than that experienced by an exclusive distributor when its exclusive distributorship is taken away and given to someone else. There is no question that the "jilted party" is damaged, but in the absence of an antitrust violation causing antitrust injury, the antitrust laws provide no remedy. In *Ace Beer Distributors, Inc. v. Kohn, Inc.*, 318 F.2d 283 (6th Cir.1963), the Sixth Circuit stated:

The fact that a refusal to deal with a particular buyer without more, may have an adverse effect upon the buyer's business does not make the refusal to deal a violation of the Sherman Act. Damage alone does not constitute liability under the Act.

*Id.* at 287. *See also Muenster Butane,* 651 F.2d at 296–98.

**7.** The complaint states that "Multivision Defendants and B & E ... have engaged in a contract, combination and conspiracy with one or more

fied no anticompetitive effect at the interbrand level of competition as a result of these decisions. As such, Futurevision's complaint charging restraint of trade based upon ESPN's and The Learning Channel's selection of one distributor over another fails to state a violation of the rule of reason.[8] The court concludes, therefore, that Futurevision's complaint fails to state a claim that the exclusive contracts in this case constitute unreasonable vertical restraints of trade in violation of section 1 of the Sherman Act.

### 2. Futurevision's Horizontal Conspiracy Claim

■■■ In paragraph 48 of its complaint, Futurevision charges that The Learning Channel and "two other channel providers," with which Futurevision had existing arrangements to utilize their programming in other markets served by Futurevision, were informed of Futurevision's intent to launch the Grenada cable system, and made no complaint about Futurevision's intent to utilize their products, until after the Grenada facility was implemented.

When the Grenada facility was completed, all three companies complained within a few hours of each other, *obviously as a result of a conspiracy with B & E.* Two of the channel providers are still considering whether to require Futurevision to discontinue their programming

and are not now named as defendants in this case. The Learning Channel has demanded that Futurevision discontinue distributing its programming.

Futurevision further alleges in paragraph 51 of the complaint that "[t]he actions of the channel providers ... are part of a general understanding, agreement and practice within the cable industry of discouraging overbuilders." Although Futurevision argues that its complaint has sufficiently alleged that the Learning Channel and ESPN are part of an unlawful horizontal conspiracy to foreclose competition among cable system operators, the court must conclude otherwise.

■■■ While summary procedures should be used sparingly in antitrust litigation, *Poller v. Columbia Broadcasting Sys. Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), the Supreme Court has mandated that the district courts "retain[ ] the power to insist upon some specificity in pleading before allowing a potentially massive [antitrust] controversy to proceed." *Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 528 n. 17, 103 S.Ct. 897, 903 n. 17, 74 L.Ed.2d 723 (1983). " '[E]nough data must be pleaded so that each element of the alleged antitrust violation can be properly identified.' " *Lombard's. Inc. v. Prince Mfg. Inc.*, 753 F.2d 974, 975 (11th

---

of the channel providers to deprive Futurevision of the right to exhibit popular channel programming." The complaint further states that "Futurevision Plaintiffs are placed at a serious competitive disadvantage in entering the markets served by [Multivision and B & E]." Absent an allegation of anticompetitive effect at the interbrand level, however, this states nothing more than "commercial disappointment" on behalf of the jilted distributor, Futurevision, *see Muenster Butane*, 651 F.2d at 296–98, for as the Sixth Circuit stated in *Crane & Shovel*:

> Every distribution choice by a manufacturer could be either a good or bad decision from a business standpoint, but the antitrust laws have never been intended to police such a choice, absent any allegation that such choice is part of a scheme to create a monopoly market power by the manufacturer, or which is based on, or causes, anticompetitive effect at the interbrand level.

854 F.2d at 810 (footnote omitted). *See also Ralph C. Wilson Indus., Inc. v. Chronicle Broad-*

*casting Co.*, 794 F.2d 1359, 1364 (9th Cir.1986) ("A vertical agreement between an individual station and an individual supplier does not, without more, mean that the suppliers have engaged in the type of exclusive dealing covered under [the antitrust laws]. Moreover, ... competition is not injured where a distributor seeks to obtain a product at the expense of any or all potential distributors.").

8. In *Elder–Beerman Stores Corp. v. Federated Dep't Stores*, 459 F.2d 138 (6th Cir.1972), the Sixth Circuit explained the rule of reason analysis in a case similar to the one at bar:

> We interpret the "rule of reason" as meaning that the granting of exclusive selling rights or acceptance of such exclusive selling rights, acts which are not prohibited by law unless there is a resulting foreclosure of market alternatives cannot, without proof of such foreclosure, form the basis for a jury verdict that the defendants had entered into a conspiracy to restrain trade. *Id.* at 146 (footnote omitted).

Cir.1985), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 851, 88 L.Ed.2d 892 (1986) (quoting *Quality Foods v. Latin American Agribusiness Dev. Corp.,* 711 F.2d 989, 995 (11th Cir.1983)). "A general allegation of conspiracy, ... without a statement of the facts constituting the conspiracy, is a mere allegation of a legal conclusion and is inadequate of itself to state a cause of action." *Larry R. George Sales Co. v. Cool Attic Corp.,* 587 F.2d 266, 273 (5th Cir.1979); *see also Elliott v. Foufas,* 867 F.2d 877, 881 (5th Cir.1989) ("In order to avoid dismissal for failure to state a claim, a plaintiff must plead specific facts, not conclusory allegations.").

In the court's opinion, Futurevision's complaint contains nothing more than a conclusory allegation that there was a horizontal conspiracy in violation of section 1 of the Sherman Act. The allegation that the "channel providers ... are part of a *general* understanding, agreement and practice within the *cable industry* of discouraging overbuilders" is, in the court's view, far too general to withstand the present motion. Indeed, the allegation is little more than a recitation of relevant antitrust principles. "Conclusory allegations that merely recite the litany of antitrust [, however,] will not suffice." *TV Communications Network, Inc. v. ESPN, Inc.,* 767 F.Supp. 1062, 1070 (D.Colo.1991) (citations omitted). Rather, as the Fifth Circuit has held:

> The pleader must allege the facts constituting the conspiracy, its object and accomplishment. *Nelson Radio and Supply Company v. Motorola,* 200 F.2d 911, 913–14 (5th Cir.1952).
>
> . . . .
>
> A general allegation of the forming of a combination or conspiracy with resulting injury to the public and to the Plaintiff simply does not satisfy the requisites for stating a cause of action. While great detail is unnecessary, a Sherman Act complaint must allege *facts* from which it can be determined as a matter of law that by reason of intent, tendency, or inherent nature of the contemplated acts, the conspiracy alleged was calculated to prejudice the public interest by unduly restricting the free flow of interstate commerce. *Fedderson Motors v. Ward,* [180 F.2d 519, 522 (10th Cir.1950) ]. As in *Fedderson,* Plaintiff herein has alleged facts which tend to show that the conspiracy as contemplated and effectuated harmed him. But Plaintiff['s] ... pleading is defective in that it is devoid of any allegations which tend to show public injury or restraint of interstate commerce.

*Larry R. George Sales,* 587 F.2d at 273–74.

■ Futurevision's allegations are not grounded in well-pleaded facts. The complaint alleges that The Learning Channel and "[t]wo [unnamed] channel providers" notified Futurevision at the same time that they would not do business with Futurevision. Futurevision then concludes that such actions were the result of a conspiracy among the channel providers to discourage overbuilders from entering the cable services market. The court, however, finds that Futurevision's complaint merely alleges parallel conduct which, without more is insufficient to establish a conspiracy. In *Theatre Enterprises, Inc. v. Paramount Film Distributing,* 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954), the Supreme Court addressed whether or not a horizontal conspiracy could be inferred solely from parallel conduct:

> [T]his Court has never held that proof of parallel business behavior conclusively established agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense. Circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy; but "conscious parallelism" has not yet read conspiracy out of the Sherman Act entirely.

*Id.* at 541, 74 S.Ct. at 259.

■ Parallel behavior may be a factor to be considered when determining the existence of a horizontal agreement that violates section 1. But it is clear that Futurevision "cannot rely on proof of parallel behavior alone." *Royal Drug Co. v. Group Life and Health Ins. Co.,* 737 F.2d 1433, 1437 (5th Cir.1984). "Allegation[s] of

parallel behavior alone [do] not establish a *prima facie* case." *Paul Kadair, Inc. v. Sony Corp. of America*, 694 F.2d 1017, 1027 n. 27 (5th Cir.1983).[9] In apparent recognition of these pleading requirements, Futurevision argues in its brief that it has alleged "parallel conduct and more." In support of its position, Futurevision cites paragraphs 48 and 50 of its complaint. However, aside from the conclusory allegation of a "general ... agreement ... within the cable industry," both paragraphs concern only the effects of the alleged conduct, not whether the conduct alleged involved anything more than parallel conduct. The court concludes that an allegation of effects is not a substitute for a proper allegation of "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 768, 104 S.Ct. at 1473.

■■■ Moreover, an allegation that The Learning Channel, ESPN, or other programming suppliers contracted to distribute their programming through exclusive dealers is not sufficient to allege an unlawful horizontal conspiracy. The Fifth Circuit has held that evidence of uniform contracts entered into separately between competing sellers and a " 'powerful buyer' " does not constitute an illegal horizontal conspiracy. *Royal Drug*, 737 F.2d at 1437. The plaintiff in *Royal Drug* argued that a horizontal conspiracy could be inferred among pharmacists because there was direct evidence of a series of vertical agreements between individual pharmacists and a single insurance company. The Fifth Circuit rejected this attempt to transform vertical agreements into a horizontal conspiracy, reasoning:

> [T]he pharmacy agreements do not run between competitors and hence do not in and of themselves establish a horizontal combination. Such a combination must be established if this sort of attack is to succeed.

*Id.* Likewise, in the present case, the alleged exclusive agreements run between each programming supplier and B & E and Multivision. There are no specific *facts* alleged as to any agreement running between The Learning Channel, ESPN and any of *their* competitors. As in *Royal Drug*, because the agreements do not run between competitors, they cannot "in and of themselves establish a horizontal combination." *Id.* As such, Futurevision has not presented the court with allegations of facts sufficient to conclude that it can maintain a viable horizontal conspiracy claim.

Further, in the case at bar, not only are no facts alleged to demonstrate the conspiracy, but the specific participants of the conspiracy are not even identified. The complaint identifies the alleged conspirators merely as "the channel providers." And it identifies only "two other channel providers" as The Learning Channel's co-conspirators. These alleged co-conspirators are not even named as defendants in this case. Additionally, the complaint contains only one express reference to ESPN and alleges no facts supporting its alleged participation in an industry-wide conspiracy. The court finds the pleading inadequate to "give [The Learning Channel and ESPN] fair notice of what [Futurevision's] claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). *See also Lombard's, Inc.*, 753 F.2d at 975.

■■■ Even if Futurevision's complaint were broadly construed to allege an actual agreement among the channel providers, it nevertheless fails to state a claim under a horizontal conspiracy theory for the same reasons that it failed to state a claim under a vertical conspiracy theory. While horizontal agreements are ordinarily illegal *per se* "without elaborate inquiry as to the precise harm they have caused or the business excuse for their use ...," *Northern Pacific Railway v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958),

---

**9.** A plaintiff relying on a theory of "conscious parallelism" must establish two elements: "(1) that the defendants engaged in consciously parallel action, (2) which was contrary to their economic self-interest so as not to amount to good faith business judgment." *Royal Drug Co.*, 737 F.2d at 1437.

"not all concerted refusals to deal should be accorded *per se* treatment." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 297, 105 S.Ct. 2613, 2621, 86 L.Ed.2d 202 (1985). As the Supreme Court recognized in *Northwest Wholesale:*

> Cases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by "either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." Sullivan, *supra*, at 261–262. *See, e.g., Silver* [*v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963)], *supra* (denial of necessary access to exchange members); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961) (denial of necessary certification of product); *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (denial of important sources of news); *Klor's, Inc.* [*v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959)], *supra*, (denial of wholesale supplies). In these cases, the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete, *Silver, supra; Radiant Burners, Inc., supra*, and frequently the boycotting firms possessed a dominant position in the relevant market. *E.g., Silver, supra; Associated Press, supra; Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). *See generally* Brodley, Joint Ventures and Antitrust Policy, 95 Harv. L.Rev. 1523, 1533, 1563–1565 (1982).

> . . . .

> Although a concerted refusal to deal need not necessarily possess all of these traits to merit *per se* treatment, not every cooperative activity involving a restraint or exclusion will share with the *per se* forbidden boycotts the likelihood

of predominantly anticompetitive consequences.

*Id.* at 294–95, 105 S.Ct. at 2619–20.

As in the court's analysis of Futurevision's vertical conspiracy claim, the court finds the horizontal conspiracy claim governed by rule of reason analysis as well. *See id.* at 296–98, 105 S.Ct. at 2620–22. The court concludes, therefore, as it did with respect to the vertical conspiracy allegation, that Futurevision has not sufficiently pleaded any anticompetitive effect. Futurevision offers only a conclusory allegation that the alleged horizontal conspiracy among the channel providers has "the clear effect of discouraging competition by overbuilders...." Futurevision contends that the defendants have conspired "to foreclose the ability of overbuilders to compete with entrenched cable system operator monopolists." The court finds these allegations insufficient under the rule of reason. Not only does Futurevision's complaint fail to allege any facts that go beyond "unsupported conjecture" as to its horizontal conspiracy theory, but it also fails to properly allege any restraint of competition as a result of the alleged conspiracy. *See Royal Drug*, 737 F.2d at 1439. In this regard, the court finds particularly instructive the Supreme Court's application of rule of reason analysis to an antitrust claim analogous to the one at bar.

In *Northwest Wholesale*, plaintiff, a retail office supply store, argued that its exclusion from a wholesale purchasing cooperative consisting of approximately 100 office supply retailers, was the result of a group boycott or concerted refusal to deal that limited its ability to compete and therefore should be considered *per se* violative of section 1 of the Sherman Act. In rejecting plaintiff's argument, the Court held:

> Unless the cooperative possesses market power or exclusive access to an element essential to effective competition, the conclusion that expulsion is virtually always likely to have an anticompetitive effect is not warranted. *See* L. Sullivan, Law of Antitrust 292–293 (1977); Brodley, 95 Harv.L.Rev., at 1563–1565. *Cf.*

*Jefferson Parish Hospital Dist. v. Hyde,* 466 U.S. 2, 12–15, 104 S.Ct. 1551, 1558–1560, 80 L.Ed.2d 2 (1984) (absent indication of market power, tying arrangement does not warrant *per se* invalidation). *See generally National Collegiate Athletic Assn. v. Board of Regents of University of Oklahoma,* 468 U.S. [85], at 104, n. 26, 104 S.Ct. [2948], at 2961, n. 26 [82 L.Ed.2d 70 (1984) ] (*"Per se* rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct"). Absent such a showing with respect to a cooperative buying arrangement, courts should apply a rule-of-reason analysis.

The District Court appears to have followed the correct path of analysis— recognizing that not all concerted refusals to deal should be accorded *per se* treatment and deciding this one should not.

. . . .

A plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects. The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive. When the plaintiff challenges expulsion from a joint buying cooperative, some showing must be made that the cooperative possesses market power or unique access to a business element necessary for effective competition.

*Northwest Wholesale,* 472 U.S. at 296–98, 105 S.Ct. at 2620–21.

Nowhere in the complaint does Futurevision allege that The Learning Channel or ESPN possesses market power individually or in combination. Moreover, when the court is confronted by specific facts in Futurevision's own complaint establishing that ESPN's and The Learning Channel's grant to Multivision and B & E of exclusive programming rights has not prevented Futurevision from entering Multivision's and B & E's markets and obtaining high market shares, the court cannot conclude that the programming offered by ESPN and The Learning Channel is "an element essential to effective competition." *Id.* at 296, 105 S.Ct. at 2620–21. Therefore, applying the rule of reason to the allegations and facts that are submitted in Futurevision's pleadings, the court concludes that there simply has been no showing in the complaint of a restraint of competition as distinguished from possible damage to Futurevision from not obtaining the programming at issue.

In sum, Futurevision's complaint does not provide any factual basis for its sweeping assertion that the granting of exclusive rights to Multivision and B & E is part of an "industry-wide" conspiracy to discourage overbuilders in violation of section 1 of the Sherman Act. In the absence of even the barest factual allegation which, if proven, would demonstrate that Futurevision *must* carry The Learning Channel and ESPN Sunday Night Football in order to compete in the relevant markets at issue in this case, the court must conclude that rule of reason analysis compels a finding that no claim has been stated, for "conclusory allegations and unwarranted deductions of fact are not admitted as true" for purposes of assessing a motion to dismiss. *Associated Builders, Inc. v. Alabama Power Co.,* 505 F.2d 97, 100 (5th Cir.1974).

B. Futurevision's Section 2 Claim

■ Section 2 of the Sherman Act bars monopolization, attempts to monopolize and conspiracies to monopolize. Futurevision has charged in its complaint that Multivision and B & E, which have monopolized, or have dangerous probabilities of monopolizing the relevant markets, have, pursuant to their efforts to preserve or regain their monopolies, entered into exclusive contracts with ESPN and The Learning Channel which foreclose competition or potential competition and facilitate B & E's and Multivision's retention of their monopolies, all pursuant to a nationwide understanding, agreement and practice within the cable industry, to which ESPN and The Learning Channel are parties, to discourage overbuilding. In their motions to dismiss, ESPN and The Learning Channel observe that the only possible section 2 claim

that Futurevision may be making against them is that they are part of a conspiracy to assist Multivision and B & E in monopolizing their markets. That is, while Futurevision's complaint recites all three section 2 offenses, monopolization, attempt to monopolize and conspiracy to monopolize, nothing in the complaint suggests that ESPN or The Learning Channel has monopolized or attempted to monopolize *its* market, i.e., the market for nonbroadcast television programming. In response to this assertion, Futurevision merely recites the elements of each of the section 2 offenses along with the allegations of its complaint and without further explanation, declares that it has stated a claim for each of these offenses. The court, cannot agree. In the court's opinion, Futurevision has not stated a claim against ESPN of monopolization or attempted monopolization.

 The elements of monopolization are:

(1) possession of monopoly power in the relevant market;

(2) willful acquisition or maintenance of that power; and

(3) causal 'antitrust' injury.

*Syufy Enter. v. American Multicinema, Inc.,* 793 F.2d 990, 993 (9th Cir.1986) (quoting *Transamerica Computer Co. v. International Business Mach. Corp.,* 698 F.2d 1377, 1382 (9th Cir.), *cert. denied,* 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983)). The elements which must be shown to establish attempted monopolization are:

(i) relevant market, including a geographic and product, (ii) dangerous probability of success in monopolizing the relevant market, (iii) specific intent to monopolize, and (iv) conduct in furtherance of such an attempt.

*TV Communications,* 767 F.Supp. at 1074. It is clear that neither of these defendants has monopoly power in a relevant market. If the relevant product market is narrowly defined as the market for The Learning

Channel and ESPN channels respectively, there would be no monopoly power, for a manufacturer's natural monopoly over its own product is not a basis for antitrust liability under section 2. *Id.* at 1071 (plaintiff failed to demonstrate that ESPN and TNT retained an illegal monopoly over a relevant market). Indeed, "[i]t would be an anomalous result ... if product markets were defined so narrowly that one always has an illegal monopoly over its own market." *Northeastern Educ. Television,* 758 F.Supp. at 1578. Consequently, relevant markets for antitrust purposes are defined in terms of the market in which a product competes. *Id.* Construing the product market in which ESPN and The Learning Channel compete more broadly as the market of suppliers of programming for cable television,[10] it still is manifest, in the court's opinion, that these defendants do not have monopoly power in that market, either singly or in combination, for they provide but a fraction of available cable programming. Moreover, as the court has observed *supra,* there is available to Futurevision comparable programming alternatives to that offered by these defendants. Finally, though it is suggested by Futurevision that the relevant market is the cable services market, neither ESPN nor The Learning Channel competes in the cable services market. As the court indicated *supra,* Futurevision's suggestion that the effect of the exclusive contracts on *its* ability to compete broadens the relevant product market to the cable services providers must be rejected; such an allegation by Futurevision, the court observed, is not a substitute for a proper allegation of [monopoly] power.[11] Since neither of these defendants has monopoly power in a relevant market, there can be no viable claim for monopolization or attempted monopolization.

 As to its claim for conspiracy to monopolize, Futurevision has made the following assertion in its complaint:

10. *But see supra* n. 4.

11. The court also noted the absence of any allegation in the complaint that these defendants have sufficient market power to foreclose

Futurevision from obtaining quality programming, or that it has been unable to effectively compete in the cable service provider market as a result of the exclusive contracts.

Multivision Defendants and B & E ... have engaged in a contract, combination and conspiracy with one or more of the channel providers to deprive Futurevision Plaintiffs of the right to exhibit popular channel programming.

Further, Futurevision charges that "[t]he actions of the channel providers ... are part of a general understanding, agreement and practice within the cable industry of discouraging overbuilders." Futurevision goes on to allege that

[b]ecause of the popularity of the programming described above [i.e., ESPN Sunday Night Football, TNT and The Learning Channel], and the cumulative effect of this growing foreclosure to overbuilders, new entrants to the market such as Futurevision Plaintiffs are placed at a serious competitive disadvantage in entering the markets served by the existing entrenched monopolies.

Futurevision argues that its complaint does not allege "that The Learning Channel [or ESPN] has monopolized or is attempting to monopolize any cable television *programming* market. Rather, Futurevision claims that B & E and Multivision are monopolizing or have monopolized the relevant cable television markets, and that The Learning Channel, along with TNT, ESPN and CMTV, is helping it. According to Futurevision, this allegation is clearly sufficient as a section 2 claim for conspiracy to monopolize against both The Learning Channel and ESPN.

■ A claim for conspiracy to monopolize in violation of section 2 of the Sherman Act requires proof of the following elements: (1) the existence of a combination or conspiracy; (2) an overt act in furtherance of a conspiracy; (3) a substantial amount of commerce affected; and (4) specific intent to monopolize. *United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); *North Mississippi Communications, Inc. v. Jones,* 792 F.2d 1330, 1335 (5th Cir.1986); *J.T. Gibbons,* 704 F.2d at 796. For the same reasons that Futurevision has failed to state a claim that The Learning Channel or ESPN unlawfully conspired to restrain trade un-

der section 1 of the Sherman Act, the court finds that Futurevision has failed to state a claim that The Learning Channel or ESPN unlawfully conspired to monopolize under section 2 of the Act. A conspiracy to monopolize in violation of section 2 requires even greater proof than is necessary to prove an unreasonable restraint of trade under section 1. *International Distrib. Centers v. Walsh Trucking Co.,* 812 F.2d 786, 793 (2d Cir.), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987).

Futurevision's complaint falls short of the minimum necessary to demonstrate that The Learning Channel's or ESPN's grant of exclusive rights was part of a conspiracy to monopolize the relevant cable service markets. Whether the denial of the specifically described "popular" and/or "important" programming can amount to an antitrust violation depends on whether any one of the channel provider defendants alone, or with the other channel provider defendants, have the requisite market power to establish a monopoly. *Northeastern Educ. Television of Ohio, Inc. v. Educational Television Assoc.,* 758 F.Supp. 1568, 1579 (N.D.Ohio 1990). It is manifest here, as it was with respect to the section 1 claims, that Futurevision's complaint fails to allege that any single channel provider defendant, or any combination thereof, has such power. *See TV Communications Network, Inc. v. ESPN, Inc.,* 767 F.Supp. 1062, 1071 (D.Colo.1991). Without market power, The Learning Channel and ESPN are in no position either to help or to hinder Multivision's and B & E's alleged efforts to monopolize their cable service markets.

■ Even were the court to conclude that Futurevision's complaint alleged the market power necessary for ESPN and The Learning Channel to aid B & E and Multivision in monopolizing their markets, dismissal of the section 2 claim would still be in order. There is no allegation that The Learning Channel or ESPN either knew or cared that B & E or Multivision was using its exclusive rights to monopolize the relevant cable service markets. As the Ninth Circuit recognized in *Syufy:* A "supplier who licenses a product to another does not

join the licensee in a conspiracy" even if "the licensee turns around and exploits the license for its own monopolistic purpose." *Syufy*, 793 F.2d at 1000–01. Rather, in order to sustain a claim for conspiracy to monopolize, a plaintiff must allege facts that tend to prove that the licensee used the licenses for monopolistic purposes and that the supplier "knew or should have known" that the licensee would do so. *Id.* Based upon this reasoning, the *Syufy* court rejected plaintiff's claim that film distributors had been helping a movie exhibitor to monopolize a local movie market:

> [T]here is no evidence that any of the distributors, in licensing films to Syufy, knew or even should have known that Syufy would use the film licenses for monopolistic purposes. Nor is there any showing that any of the distributors shared with Syufy a common purpose in monopolizing the hardtop theater market in the San Jose area.

*Id.* at 1001. In the present case, Futurevision's complaint alleges no facts to support either conclusion.

 In addition, Futurevision has failed to allege that The Learning Channel or ESPN had a specific intent to monopolize any relevant market. *See North Mississippi Communications*, 792 F.2d at 1335; *Belfiore v. New York Times Co.*, 826 F.2d 177 (2d Cir.1987), *cert. denied*, 484 U.S. 1067, 108 S.Ct. 1030, 98 L.Ed.2d 994 (1988). The bare fact that ESPN and The Learning Channel granted exclusive licenses to Multivision and B & E does not provide a sufficient basis to infer that ESPN and The Learning Channel were parties to

an intentional conspiracy to monopolize either B & E's or Multivision's markets.

> In general, a business entity has a qualified right to deal with whom it pleases.... Unless plaintiff can illustrate that no valid business reason exists for the refusal to deal, section 2 does not restrict the right to freely exercise independent discretion as to the parties with whom to deal.

*TV Communications*, 767 F.Supp. at 1071 (citations omitted). Not only does the complaint in the case *sub judice* fail to allege any specific intent to monopolize, but it also fails to allege that ESPN and The Learning Channel have no valid business reason for refusing to supply Futurevision with their programming.[12]

 Finally, even if Futurevision could somehow allege facts sufficient to create the inference that ESPN and The Learning Channel were parties to a conspiracy to monopolize, dismissal would still be warranted because the complaint fails to allege *facts* indicating that any action allegedly joined in by ESPN or The Learning Channel has caused any injury to competition. *See J.T. Gibbons, Inc.*, 704 F.2d at 796–97 (directed verdict on conspiracy to monopolize claim was appropriate where plaintiff failed to prove any competitive injury). As explained above, Futurevision's complaint does not allege the injury to competition necessary to sustain its section 1 claim. The court therefore finds the complaint insufficient to sustain its section 2 claim as well. *See* 3 P. Areeda & D. Turner, *Antitrust Law* para. 839 ("Any arrangement that could be considered a combination or

---

12. Futurevision also alleges that the ESPN and The Learning Channel exclusive contracts with Multivision and B & E "deprive Futurevision Plaintiffs of the right to exhibit popular channel programming." ESPN urges in its motion to dismiss that this allegation does not state a claim since under the law, Futurevision has no "right" to exhibit "popular channel programming."

Section 2 does prohibit certain refusals to deal if the denial violates the "essential facilities" doctrine. *United States v. Terminal R.R. Ass'n*, 224 U.S. 383, 410, 32 S.Ct. 507, 516, 56 L.Ed. 810 (1912); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). To establish liability under this principle, Futurevision must demonstrate (1) control of the essential facility by defendants, (2) competitor's inability practically or reasonably to duplicate the facility, (3) denial of the use of the essential facility to a competitor, and (4) feasibility of providing the facility. *McKenzie v. Mercy Hosp.*, 854 F.2d 365, 369 (10th Cir.1988). Futurevision's own complaint makes clear that it has access to sufficient programming to allow it to enter, and succeed, in the relevant cable service markets without access to the Learning Channel or ESPN's Sunday Night Football. As such, any claim by Futurevision that it has been denied an "essential facility" by the defendants in this case cannot stand.

conspiracy to monopolize must necessarily be an unreasonable restraint of trade offending Sherman Act § 1."); *International Distrib. Centers*, 812 F.2d at 793–96.

In ruling on defendants' motions, the court notes that the Supreme Court has held that it is appropriate to summarily dispose of an antitrust conspiracy claim in those cases in which it is clear that the defendant "had no motive to enter the alleged conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 595, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538 (1986). *See also Royal Drug*, 737 F.2d at 1439; *TV Communications Network*, 767 F.Supp. at 1071, 1074. In this case, it is illogical to suppose that The Learning Channel and ESPN would conspire to reduce competition among cable system operators with which it must deal. As Futurevision argues in its brief, foreclosing competition among cable system operators would in actuality foster the development of cable system monopolies. But the creation of such monopolies would in turn enable cable system operators to drive down the price that they paid to ESPN and The Learning Channel for their programming. If ESPN's and The Learning Channel's programming is as essential as Futurevision purports it to be, it would be contrary to the programmers' interests to aid cable system operators in achieving monopoly power. The court is therefore persuaded that the cable programmers would have no rational economic motive to conspire against their own interests. *See TV Communications Network*, 767 F.Supp. at 1074 (defendant cable companies would have "no rational economic motive to conspire against their own interests"; "would be contrary to the cable companies' inter-

ests to aid these organizations in achieving monopoly power"). Indeed, "as presumably rational business[es]," ESPN and The Learning Channel "had every incentive *not* to engage in the conduct for which they are charged, for the likely effect would be to generate losses for [them] with no corresponding gains." *Matsushita*, 475 U.S. at 595, 106 S.Ct. at 1360 (emphasis in original).

In sum, Futurevision has failed to allege *facts* sufficient to support its conclusory allegation that The Learning Channel and ESPN intended to assist B & E and Multivision in allegedly monopolizing the relevant cable service markets.[13] Moreover, though Futurevision has alleged "that the conspiracy as contemplated and effectuated harmed [it]," Futurevision's "pleading is [nevertheless] defective in that it is devoid of any allegations which tend to show" that any alleged conspiracy "restrain[ed] ... interstate commerce." *Larry R. George Sales*, 587 F.2d at 274. To the contrary, Futurevision's own allegations concerning its success in competing in the relevant markets without the programming at issue make clear that there has been no anticompetitive effect as a result of any alleged conspiracy. As such, Futurevision's complaint does not state a claim for conspiracy to monopolize against either ESPN or The Learning Channel. The court concludes, therefore, that Futurevision's section 2 claims must be dismissed.

### C. Futurevision's Price Discrimination Claim

 In its complaint, Futurevision charges at paragraph 65 and 66, as follows:

As a result of the market power of the large MSO's arising from their large

---

**13.** Requiring a plaintiff to provide some evidence that indicates that the defendant had the specific intent to monopolize is necessary to ensure that the antitrust laws "do not chill the very conduct the antitrust laws are designed to protect." *Matsushita*, 475 U.S. at 594, 106 S.Ct. at 1360. As explained *supra*, exclusive dealing contracts, like other vertical arrangements, often create legitimate pro-competitive benefits. *See Continental T.V.*, 433 U.S. at 54–56, 97 S.Ct. at 2559–60; *Muenster Butane*, 651 F.2d at 295–98. For this reason, it is well recognized that they are judged under the rule of reason. *See*

*id.* Under Futurevision's theory, any supplier that grants an exclusive license to a licensee who allegedly uses the license as part of a scheme to monopolize its market is *per se* liable under the antitrust laws for conspiracy to monopolize. Such an application of the antitrust laws, however, would obviously result in suppliers foregoing the potential pro-competitive benefits from granting such licenses, and would therefore "chill the very conduct the antitrust laws are designed to protect." *Matsushita*, 475 U.S. at 594, 106 S.Ct. at 1360.

number of subscribers, and also as a result of the close relationship of channel providers, MSO's such as Multivision Defendants receive an unjustified discount on the price paid by the MSO's to channel providers. *At this time Futurevision Plaintiffs do not know if B & E received such discounts.* The discount is discriminatory and provides a substantial and unnecessary barrier to entry for new firms providing cable services.

Thus, *the actions of Channel Provider Defendants in providing such discriminatory prices,* and the soliciting of and receipt of such prices by Multivision Defendants, constitute contracts, combinations, or conspiracies which unreasonably restrain trade and unlawfully create and maintain monopolies in the market for cable services.

Nowhere in the complaint is it affirmatively alleged that either ESPN or The Learning Channel provided discounts to B & E or to Multivision. Indeed, it is acknowledged in the complaint that Futurevision "does not know" whether B & E has received such discounts. And all that is charged relative to Multivision is that cable service providers such as Multivision which operate multiple cable systems solicit and receive discounts from channel providers and that the provision of discriminatory prices by channel providers is an unlawful restraint on trade. To the extent, therefore, that Futurevision has attempted to state a claim against either of the movants for price discrimination, that attempt must fail.

### D. Futurevision's State Law Claims

■■■■ Count III of Futurevision's complaint alleges that the above described actions of defendants ESPN and The Learning Channel violate Mississippi antitrust laws. *See* Miss.Code Ann. § 75–21–1,

*et seq.* Because the court has determined that Futurevision's complaint charging violations of federal antitrust statutes is to be dismissed at this time, the court further concludes that Futurevision's allegations of state law violations must be dismissed as well. *See Walker v. U–Haul of Mississippi,* 734 F.2d 1068, 1070 n. 5 (5th Cir.1984) (treating Mississippi and federal antitrust claims as "analytically identical"); *Uniroyal, Inc. v. Hoff and Thames, Inc.,* 511 F.Supp. 1060, 1067 (S.D.Miss.1981). Likewise, the court is of the opinion that Futurevision's tortious breach of contract claim against The Learning Channel must also be dismissed. As the Supreme Court has held, where jurisdiction over state law claims is based solely on pendent jurisdiction,[14] "[i]f the federal claims are dismissed before the trial the state claims should be dismissed." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

### Conclusion

For the reasons set forth above, it is ordered that the motions of defendants ESPN and The Learning Channel are granted. Accordingly, all claims by Futurevision plaintiffs against defendants ESPN and The Learning Channel are hereby dismissed with prejudice.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

ORDERED this 17th day of March, 1992.

---

**14.** Absent pendent jurisdiction, this court does not have jurisdiction to adjudicate Futurevision's state law claims. According to the complaint, the five Futurevision plaintiffs are incorporated in Mississippi. In addition, one of the defendants, B & E, has its principal place of business in Mississippi. The diversity statute, 28 U.S.C. § 1332(c), provides that, for purposes of determining diversity jurisdiction, a corporation is deemed a citizen of both its state of

incorporation and the state in which it has its principal place of business. It is clear, therefore, that this court does not have diversity jurisdiction over this matter, as both Futurevision and B & E are deemed citizens of Mississippi. Under the rule of *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), this lack of "complete" diversity precludes the exercise of diversity jurisdiction.